ORION FLIGHT SERVICES, INC., Plaintiff-Respondent,†

v.

BASLER FLIGHT SERVICE, a division of Basler Turbo Conversions, LLC, Defendant-Appellant.

Court of Appeals

*No. 03–1731. Submitted on briefs October 21, 2004.—Decided November 24, 2004.*

## 2004 WI App 222

(Also reported in 692 N.W.2d 804.)

† Petition to review granted 3-8-2005.

820

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Laura A. Brenner, Beth Ermatinger Hanan* and *Christopher P. Dombrowicki* of *Reinhart Boerner Van Deuren SC* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Russell A. Klingaman* and *Jeffrey D. Patza* of *Hinshaw & Culbertson* of Milwaukee.

A nonparty brief was filed by *Thomas L. Skalmoski* of *Weiss Berzowski Brady LLP* of Milwaukee for Petroleum Marketers Association of Wisconsin/Wisconsin Association of Convenience Stores, Inc.

A nonparty brief was filed by *Colleen D. Ball* of Wauwatosa for Midwest Airlines and Wisconsin Aviation Trades Association, Inc.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. This case involves a dispute between Orion Flight Services, Inc. and Basler Flight Service, A Division of Basler Turbo Conversions, LLC, two vendors of aviation fuel, about whether the Unfair Sales Act requires Basler to set minimum prices in accordance with the Unfair Sales Act's minimum markup provisions for motor vehicle fuel. They also dispute whether Orion has a private cause of action against Basler for not following those provisions. We conclude that the markup and private cause of action provisions do not apply because the legislature did not understand "motor vehicle fuel" to include aviation fuel. The legislature intended these provisions to protect small businesses from being run out of business by the predatory pricing practices of large competitors. "Mom

821

and pop" establishments simply are not in the business of selling fuel for use in aircraft. Moreover, closely related statutes exclude aircraft from the definition of "motor vehicles." We therefore reverse the circuit court's preliminary injunction forcing Basler to sell at marked-up costs and dismiss Orion's complaint.

¶ 2. Pursuant to a lease with Winnebago county, Basler has sold aviation fuel at Wittman Regional Airport in Oshkosh, Wisconsin since 1957. It is a fixed base operator (FBO), a vendor of services at an airport or airfield. Basler sells Jet A fuel and 100 LL aviation fuel. It operates a self-service pump as well as a fleet of trucks that travel to aircraft for refueling.

¶ 3. On May 29, 2002, Winnebago county entered into a separate lease with Orion to operate as an FBO at Wittman. Orion, like Basler, sells 100 LL aviation fuel using a fleet of trucks. It does not operate a pump, however.

¶ 4. Orion began its operations at Wittman on August 21. Its price per gallon on aviation fuel was $2.54. At that time, Basler sold its truck-delivered fuel for five cents per gallon higher, $2.59, while it priced its pumped fuel significantly lower, at $1.90 per gallon. In late September, Orion dropped its price to $1.99 per gallon. A price war ensued.[1]

¶ 5. On September 22, following Orion's price decrease, Basler lowered its truck price to $1.89 per gallon and its pump price to $1.79 per gallon. Orion responded a few days later by changing its price per

---

[1] The parties appear to disagree about who began this "price war." We understand Basler to blame Orion for starting it with the $1.99 per gallon price change. Presumably, Orion saw the price change as a reaction to Basler's pump price. We take no position on this issue.

gallon to $1.69. Basler lowered its pump price one week later to $1.59 per gallon, where it stayed until early January 2003.

¶ 6. In January, Basler raised its pump price first to $1.65 per gallon and then, on January 8, to $1.80 per gallon. On February 20, it again raised the price to $1.99 per gallon. Because the record contains no data on Orion's prices following the $1.69 per gallon price change, it is unclear at what point the price war ended. In any event, it continued for several months.

¶ 7. In November 2002, as this battle continued, Orion complained to the Wisconsin Department of Agriculture, Trade and Consumer Protection. Orion alleged that Basler had violated the Unfair Sales Act, Wis. Stat. § 100.30 (2001–02),[2] by selling at below-cost prices. The DATCP began an investigation.

¶ 8. On March 19, before the DATCP had informed the parties of the results of its investigation, Orion filed a complaint in the Winnebago county circuit court alleging the violation of the Unfair Sales Act. The complaint prayed for declaratory and injunctive relief as well as damages. Orion obtained an ex parte temporary restraining order, which prohibited Basler from selling below the statutory minimum price and set March 27 as the hearing date on Orion's motion for preliminary injunctive relief.

¶ 9. Two days later, on March 21, the DATCP sent Basler a warning letter, detailing the results of its investigation. It determined that Basler had been in violation of Wis. Stat. § 100.30 for selling its 100 LL aviation fuel below cost when § 100.30 prohibits the below-cost wholesale or retail sale of merchandise. The

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless noted otherwise.

DATCP calculated Basler's minimum legal selling price (its cost) at approximately $1.78 and concluded that Basler's violation had continued until January 8, 2003, when it had raised its per gallon price to $1.80.

¶ 10. The warning letter further stated that the DATCP did not find Basler in violation of the minimum markup provisions of WIS. STAT. § 100.30, which require sellers of motor vehicle fuel to sell at a minimum markup above their real costs. According to the letter, the DATCP had concluded that 100 LL aviation fuel did not fall within the meaning of "motor vehicle fuel" as used in the Unfair Sales Act. The DATCP retracted this conclusion later the same day, however, in response to a phone call from Orion's attorney. It decided that it needed more time to research that particular issue before issuing a final interpretation.

¶ 11. The hearing on Orion's preliminary injunction motion began on March 27 and continued on May 2. During the interim, Basler filed its answer and counterclaim to the complaint. Essentially, it admitted the factual allegations related to pricing on various dates but denied that it sold motor vehicle fuel. According to Basler, Orion had no cause of action because the Unfair Sales Act does not recognize a cause of action against sellers of aviation fuel. In the alternative, it counterclaimed for injunctive and declaratory relief, as well as damages against Orion for violating the Unfair Sales Act.

¶ 12. To sum up the main thrust of the parties' positions below, Basler relied on WIS. STAT. ch. 78 for its argument that the Wisconsin legislature did not intend for "motor vehicle fuel" to encompass fuel used in aircraft. It pointed out that ch. 78, the only section of the Wisconsin Statutes to define the term, contained separate definitions for "motor vehicle fuel" and "avia-

tion fuel." It asserted that because the two statutes were related insofar as ch. 78 computed the taxes that WIS. STAT. § 100.30 required sellers to add in their minimum markup price, they should be read together. Both statutes, therefore, had the same definition of "motor vehicle fuel," and the omission of a reference to aviation fuel in § 100.30 must have been by legislative design. Chapter 78 defines "motor vehicle fuel" as "gasoline or diesel fuel" and "motor vehicle" as "any automobile, truck, truck-tractor, tractor, bus, vehicle or other conveyance that is self-propelled by an internal combustion engine or motor *and licensed for highway use,* except that 'motor vehicle' does not include mobile machinery and equipment." WIS. STAT. § 78.005(12), (13) (emphasis added).

¶ 13. Basler concluded that because the markup and private cause of action provisions in the statutes referred only to motor vehicle fuel, (1) the markup provisions were inapplicable and (2) Orion could not rely on WIS. STAT. § 100.30 for a private cause of action against Basler. Basler also relied on the common meaning of "motor vehicle" as excluding aircraft in support of its determination that "motor vehicle fuel" did not include aviation fuel. Basler also contended that the policy of the statute was to protect "mom and pop" gas stations from large loss leaders like Wal-Mart and that in doing so, the legislature did not mean to target FBO's selling aviation fuel.[3]

¶ 14. Orion countered that the definition of "motor vehicle fuel" in WIS. STAT. ch. 78 did not apply. It

---

[3] Basler also argued that applying the minimum markup provisions in the Unfair Sales Act to Basler would violate due process based on insufficient notice. We need not address this argument, which Basler reasserts here, given our disposition of the case.

argued as follows. Chapter 78 and the Unfair Sales Act were not sufficiently related and should not be read together: ch. 78, the tax code, had an entirely different purpose from Wis. Stat. § 100.30, a consumer protection measure. Moreover, the definition of "motor vehicle fuel" in the DATCP's implementing regulations to § 100.30 applies. According to Wis. Admin. Code § ATCP 105.001(4) (Sept. 2004),[4] " 'Motor vehicle fuel' means any liquid prepared, advertised or sold for use as or commonly and commercially used as a fuel in internal combustion engines." "The definition is very straight forward [*sic*]—and clearly includes fuel sold for use in . . . aircraft." Because the definition is unambiguous, the court may begin and end with the plain language of the regulation. The common meaning of "motor vehicle fuel" includes fuel used in aircraft. Aircraft are vehicles propelled by motors.

¶ 15. Orion's argument continued: Basler's argument that the DATCP exceeded its authority in defining "motor vehicle fuel" this way simply lacks support. The Wisconsin legislature implicitly ratified the DATCP's definition when, subsequent to the DATCP's definition, the legislature amended the Unfair Sales Act without defining the term differently. Finally, applying the Unfair Sales Act to Basler serves the purpose of the Unfair Sales Act because Basler is engaging in the kind of "predatory pricing scheme" that the Act intended to prohibit, i.e., one in which a vendor sells below cost in order to outprice smaller competitors and run them out of business. Orion pointed out that "Basler has considerably greater resources than Orion" and can deal more

---

[4] All references to the Wisconsin Administrative Code are to the Sept. 2004 version unless otherwise noted. The definition in the current version is identical to the one Orion relied upon below.

easily with lost revenues. Moreover, Orion argued that if it went out of business, the type of consequences that Wis. Stat. § 100.30(1) references might ensue, namely, losses of jobs, nonpayment of loans and taxes, possible bankruptcy, and disruption of leases, the last presumably referring to its own lease with Winnebago county.

¶ 16. The circuit court ultimately ruled in favor of Orion and granted a preliminary injunction. The court signed the order on June 17, 2003. The circuit court relied heavily on the statute's policy of preventing sellers from running competitors out of business. It appeared to accept the definition of "motor vehicle fuel" in Wis. Admin. Code ch. ATCP 105 over the Wis. Stat. ch. 78 definition based on (1) the differing purpose of the tax statutes and (2) an assumption that excluding Basler's sale of aviation fuel from the definition would circumvent the purpose of Wis. Stat. § 100.30. It stated,

> And when I look it seems real clear to me that when we start to talk about the Unfair Sales Act that at least in my mind we use the definition as it has been found in Chapter — of the Ag Code of 119 and 105. It is that generic definition of the internal combustion. There is a lot of things that if it wasn't that definition, don't make sense to me. Doesn't make sense to me that I can ride up in my boat on the side of the river, fill up, and not be subject to this definition even though I have the exact same Chevrolet engine in my boat that was in my car that I just got out of to get into my boat.

¶ 17. We accepted Basler's interlocutory appeal, in part because the preliminary injunction presupposed that Wis. Stat. § 100.30 provided Orion with a cause of action. We received briefs from the parties as well as two amicus briefs. One brief was from the Petroleum Marketers Association of Wisconsin/Wisconsin Associa-

tion of Convenience Stores, Inc. We received the other from Midwest Airlines and Wisconsin Aviation Trades Association, Inc.

¶ 18. Basler essentially requests this court to review the legal sufficiency of Orion's complaint, arguing that we ought to dismiss the case for failure to state a cause of action. We review this issue de novo. *Williams v. Security Sav. & Loan Ass'n*, 120 Wis. 2d 480, 482, 355 N.W.2d 370 (Ct. App. 1984). We will not determine that a complaint fails to state a claim unless it is obvious that the plaintiff could not recover under any circumstances. *Id.* at 482–83.

¶ 19. In this case, the dispositive facts are uncontested. Both parties agree what prices Basler charged for its fuel and when it charged those prices. They further agree that they are competing vendors of 100 LL aviation fuel. They simply disagree about whether this type of fuel qualifies as motor vehicle fuel for purposes of the Unfair Sales Act, such that the minimum markup provisions apply and the statute gives Orion a private cause of action against Basler. When the parties agree on the facts and merely dispute the applicable law, the case presents a question of law that we review independently. *State v. Briggs*, 214 Wis. 2d 281, 285, 571 N.W.2d 881 (Ct. App. 1997). Here, we must ascertain the applicable law by interpreting WIS. STAT. § 100.30. Statutory construction also involves a question of law that mandates our de novo review. *Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148 (1996). Our interpretation of a statute attempts to give effect to the legislative intent, based on the statute's language, scope, history, context, subject matter, and purpose. *Id.* We ascertain these factors by

examining the text and structure of the statute, rather than extrinsic sources, unless the statute is ambiguous. *See State ex rel. Kalal v. Circuit Court*, 2004 WI 58, ¶ 48, 271 Wis. 2d 633, 681 N.W.2d 110.

¶ 20. We begin with the language of Wis. Stat. § 100.30. Subsection (3), entitled, "Illegality of loss leaders," reads in part:

> Any sale of any item of merchandise either by a retailer, wholesaler, wholesaler of motor vehicle fuel or refiner, *at less than cost as defined in this section* with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor, impairs and prevents fair competition, injures public welfare and is unfair competition and contrary to public policy and the policy of this section. Such sales are prohibited.

(Emphasis added.) For motor vehicle fuel, "cost" includes a minimum markup amount. Depending on the identity of the vendor (whether it qualifies as a refiner, a wholesaler, or a person other than a refiner or wholesaler), whether the vendor sells at a retail station or at some other place, and whether the sale is a retail sale or wholesale sale, the minimum markup percentages vary among 3%, 6%, and 9.18%. *See generally* § 100.30(2)(am)1m., (c)1g. and 1r. The Unfair Sales Act also contains special rules for calculating costs of tobacco and certain alcohol products. *See generally* § 100.30(2)(am)1. and (c)1. For other merchandise, the Unfair Sales Act contains no markup requirements in computing "cost." *See* § 100.30(2)(am)2. and (c)2. Subsection (5m) allows injured parties to bring a private cause of action against any vendor who sells· motor vehicle fuel in violation of subsec. (3).

¶ 21. The statute contains no definition of "motor vehicle fuel." Meanwhile, both parties contend that

their respective definitions of the term represent its true commonsense meaning. Certainly, if we leave aside the context and history of the statute and simply look at those three words, neither party advances a definition wildly at odds with common sense. Given the theoretical plausibility of either definition, we must look at other factors to ascertain the legislative intent.

¶ 22. We begin with the policy behind the act, as stated by the legislature. We have already quoted WIS. STAT. § 100.30(3), which prohibits selling "at less than cost." Moreover, the legislature included a policy statement in subsec. (1), detailing some of the consequences the legislature intended the Unfair Sales Act to avoid. As Orion has pointed out, these consequences include commercial dislocations, misleading consumers, burdening commerce and diverting business from dealers who price their products fairly, unemployment, disruption of leases, and nonpayment of taxes and loans. *See* § 100.30(1). From this language, we conclude that the legislature intended the Unfair Sales Act to prevent large vendors from driving *small* competitors out of business—indeed, it seems clear that, all else being equal, a business will be unable to topple a competitor with similar resources.

¶ 23. Given the legislature's intention to protect *small* businesses, we cannot accept a definition that encompasses every type of fuel that one would put into a vehicle with a motor. To do so would include fuels, such as jet fuel, that small "mom and pop" establishments would not even be in the business of selling in the marketplace. It is obvious that jets must use *enormous* amounts of fuel and that with enormous quantities come huge revenue flows. Jet fuel is easily a million-dollar market. It is also common knowledge that these mass quantities of fuel somehow have to be

stored and transported to the aircraft. Common sense would reveal that this sort of market is, as Midwest/WATA state in their amicus brief, "beyond the ken" of the "mom and pop" businesses the legislature intended to protect.[5]

---

[5] The Midwest/WATA brief discusses several differences between the jet fuel market and the market for motor vehicle fuel. We acknowledge Orion's concern, which it stated in its written motion for leave to respond to the Midwest/WATA brief, that this brief is essentially an advocacy brief that brings up numerous facts not of record. The differences that Midwest and WATA asserted between the jet fuel market and the sale of motor vehicle fuel were chief among those facts Orion found objectionable. To be sure, Midwest and WATA bring up numerous facts not of record to support their conclusion that "Small companies are not players in a marketplace where futures contracts for jet fuel sell for millions of dollars." For example, they tell us that unlike drivers of roadway vehicles, jet fuel consumers often purchase their fuel years in advance via multimillion-dollar oil futures contracts, not based on daily pump prices. They also tell us that it takes 150 tons of fuel to fill one Boeing 747. Although these facts are certainly consistent with our commonsense impression and lead to the same conclusion, we have not relied upon them.

Moreover, although the parties agreed below that their dispute did not include the sale of jet fuel, which both parties sell, counsel for Orion opined at the motion hearing that the ATCP definition of "motor vehicle fuel" would extend to jet fuel as well because jet engines have internal combustion chambers. We agree that jet fuel is relevant insofar as it illustrates how far away from the legislative intent we would stray if we followed Orion's contention about the meaning of "motor vehicle fuel" to its logical conclusion. Midwest and WATA are proper amici to point out that issue, given their large economic stake—as participants in the jet fuel industry—in our decision.

¶ 24. We also conclude that including aviation fuel in the definition of "motor vehicle fuel" strays too far from the legislative intent. Plainly, the idea that one vendor will be able to undermine the business of a competing vendor by keeping its prices below those of its competitor rests on the assumption that consumers keep apprised of current pump prices. Aircraft pilots obviously do not fly around looking for aviation fuel stations en route in the same way an automobile driver watches the signs on the highway. Similarly, they do not move on to the next station if they believe they can get a better price there. They are destination based, and they get their fuel from whatever station happens to be at their assigned destination.

¶ 25. The legislative context and history of WIS. STAT. § 100.30 further support our conclusion that "motor vehicle fuel" as used in the Unfair Sales Act excludes aviation fuel from its definition. As Midwest and WATA point out, when we interpret statutory language, we may look to language in surrounding and related provisions. *See Kalal*, 271 Wis. 2d 633, ¶ 46.

> Context is important to meaning. So, too, is the structure of the statute in which the operative language appears. Therefore, statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.

*Id.* (citations omitted). We must read § 100.30 in the context of WIS. STAT. ch. 100—entitled, "Marketing; TRADE PRACTICES"—as a whole. The statutes in this chapter are not only "surrounding" statutes because

they appear in the same chapter but are also "closely related" because they all deal with trade and marketing.

¶ 26. In 1986, when the Wisconsin legislature first introduced the term "motor vehicle fuel" into the Unfair Sales Act, *see* 1985 Wis. Act 313, other provisions in Wis. Stat. ch. 100 defined the term "motor vehicle," and we must assume that "motor vehicle fuel" meant the type of fuel used in a "motor vehicle" as these provisions defined it. These other provisions in the 1985–86 version of the statutes cross-referenced to the definition of "motor vehicle" contained in Wis. Stat. § 340.01(35) (1985–86). *See* Wis. Stat. §§ 100.205(1)(c), 100.21(1)(d), and 100.42(1)(h) (1985–86). Section 340.01(35) (1985–86) stated that "motor vehicle" meant "a *vehicle* which is self-propelled." (Emphasis added.) A follow-up provision, § 340.01(74) (1985–86), defined "vehicle" in pertinent part as "every device in, upon or by which any person or property is or may be transported or drawn *upon a highway*." (Emphasis added.) Moreover, although not necessary to our conclusion that the Wisconsin legislature's original intended definition of "motor vehicle" meant to include only vehicles transported or drawn upon a highway, we note that all of the provisions just discussed remain substantively the same in the current version of the Wisconsin Statutes.[6]

---

[6] Orion protests in its motion for leave to respond to the Midwest/WATA brief that the definitions contained in Wis. Stat. § 340.01 are irrelevant because whereas the other provisions in Wis. Stat. ch. 100 contained a cross-reference, the Unfair Sales Act did not. We find this argument without merit. Although it "would have been very easy for the legislature to add a reference to [Wis. Stat. ch.] 340 in the text of [Wis. Stat.] § 100.30," we are still faced with the fact that § 100.30 did not contain its own definition. Thus, at the time the statute was enacted, we would

¶ 27. Although Orion urges us to look to the definition of "motor vehicle fuel" in WIS. ADMIN. CODE § ATCP 105.001(4), the legislative intent in 1986 was clear. The DATCP's mandate to promulgate implementing regulations was limited to those that were "not inconsistent with law." *See* WIS. STAT. § 93.07(1) (1985–86) (giving the DATCP authority to make regulations for the enforcement of WIS. STAT. ch. 100). Even if we assume that the DATCP intended its definition to include aviation fuel, "[t]he rule-making power [of an administrative agency] does not extend beyond the power to carry into effect the purpose as expressed in the enactment of the legislature. 'A rule out of harmony with the statute is a mere nullity.' " *Village of Plain v. Harder*, 268 Wis. 507, 511, 68 N.W.2d 47 (1955) (citations omitted). Because we have construed the Unfair Sales Act to exclude aviation fuel from its intended meaning of "motor vehicle fuel," the DATCP's definition may extend no further.

¶ 28. We conclude that Basler does not need to mark up its prices because neither party is in the business of selling "motor vehicle fuel" as used in the Unfair Sales Act. We emphasize that Orion is not left out in the cold by this ruling, at the mercy of predatory pricing by Basler. Nothing in our decision allows Basler to sell its fuel for less than what it cost; it simply clarifies that WIS. STAT. § 100.30 does not require Basler to inflate its costs in calculating its minimum legal selling price. Separate and apart from whether Basler is selling motor vehicle fuel, the Unfair Sales Act also prohibits a vendor from selling any merchandise below

---

still have looked to the related provisions in ch. 100 to ascertain the intended meaning of the term.

cost. Therefore, if Basler sells its nonmotor vehicle fuel below cost, it is a violation of the Unfair Sales Act. We point out, however, that Orion would not have a private cause of action in this instance. Private causes of action pertain only to sales of motor vehicle fuel and tobacco products. Thus, Orion's proper remedy is to alert the attorney general or the DATCP. *See* § 100.30(4) (the DATCP or a district attorney may commence an action). Accordingly, we reverse the circuit court's award to Orion of preliminary injunctive relief.

*By the Court.*—Order reversed.